Filed 7/22/26  P. v. Melendez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>

THE PEOPLE,

     Plaintiff and Respondent,

v.

AARON JOSHUA MELENDEZ,

     Defendant and Appellant.

</td><td>

A172391

(San Mateo County
Super. Ct. No. 23-SF-014885-A)

</td></tr>
</table>

After defendant Aaron Melendez and Tatiana C. ended their relationship in 2021, Melendez smashed the window of Tatiana's car and later threw a dumbbell through a window of her apartment.  In October 2022, Melendez pleaded no contest to misdemeanor vandalism and a restraining order was issued prohibiting him from having any contact with Tatiana.  But four days after that order issued, Melendez began emailing Tatiana, going on to send her hundreds of emails over the ensuing months, many of them threatening in nature.  A jury found Melendez guilty of stalking, three counts of criminal threats, three counts of attempted criminal threats, and two counts of contempt of court, and the trial court sentenced him to four years and four months in prison.  He argues that the trial court erred in modifying the standard CALCRIM instruction on unanimity to indicate that it applied to two of the counts of criminal threats "in particular."  We affirm.

## BACKGROUND

On September 14, 2023, the San Mateo County District Attorney filed a complaint, and on September 16, 2024, the operative amended information, charging Melendez with stalking (Pen. Code,[1] § 646.9, subd. (b)) (count 1), six counts of criminal threats (§ 422, subd. (a)) (counts 2–7), and two counts of misdemeanor contempt of court (§ 166, subd. (c)(1)) (counts 8 and 9).[2] As to the five counts of criminal threats, the information alleged that they took place on February 4, 14, 18, May 26, between August 9 and 20, and September 16, respectively (all in 2023).

Trial took place over four days from September 18 to 25, 2024.

**Tatiana C.'s Testimony**

Tatiana C. met Melendez in 2020, and they dated for a year, but Tatiana ended the relationship because it was "very toxic." Melendez "damaged [her] vehicle several times," including by slashing her tires and denting the front of her car. He "would e-mail [her] constantly how he was going to damage [her] property" and "how he was going to harm [her]," and engaged in "constant" "really negative name calling." After the relationship ended, Tatiana indicated that she no longer wished to have contact with Melendez. At first, "[h]e seemed like he was on board, and then a couple of days later he decided that he didn't get closure and he wanted to meet in person." And then began the "e-mails, harassment, [and] the stalking . . . ."

In April 2021, Melendez smashed the windshield of Tatiana's vehicle while it was parked in front of her home, and sent her a text message that

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    With respect to counts 1–7, the amended information alleged six aggravating factors pursuant to section 1170, subdivision (b)(2).

2

said "Enjoy." Pacifica police responded, and Tatiana provided them with security camera footage of the incident.

On July 30, Melendez drove to Tatiana's home and began yelling at her outside the window of his car. She opened her window and said, "What are you doing here?" She interacted with Melendez for a "minute or two," then closed her window and turned to walk towards her kitchen. Melendez then threw an eight-pound dumbbell weight through her front window, shattering it. When Pacifica police responded, they found a cell phone on the curb. The phone's email application had two accounts associated with Melendez's name.

On October 25, 2022, Melendez pleaded no contest to misdemeanor vandalism (§ 594, subd. (b)(1)) in connection with the July 30 incident. That same day, the court issued a restraining order prohibiting Melendez from contacting Tatiana by any means, including electronically.

Tatiana changed her phone numbers and began using a previous email address instead of her primary one in order to avoid contact with Melendez. Nevertheless, on October 29—four days after the restraining order issued— she again began receiving emails from Melendez, who went on to send her "hundreds" of emails over the ensuing months, sometimes multiple times a day.

**The Emails**

San Mateo County Sheriff's Detective Richard Deschler obtained a warrant for Melendez's Gmail account for the period October 25, 2022 to August 23, 2023, and found "thousands" of emails to Tatiana. During his testimony at trial, over 25 exhibits containing numerous of those emails were admitted into evidence.[3]

---

[3]     By way of representative examples, on February 3, 2023, between 9:11 a.m. and 6:23 p.m., Melendez sent Tatiana emails saying, "I will beat the shit

3

We will discuss certain emails that the prosecution would come to rely on as the basis for the criminal threats charges, as follows.

On February 4, 2023—as reflected in the People's Exhibit 12—Melendez first emailed Tatiana at 12:33 a.m., " 'You don't deserve to live bitch' "; at 6:37 a.m., " 'I'll chop you into pieces snake bitch' "; at 6:42 p.m., " 'I'll pop all your tires and bash your windshield stupid hoe' "; at 6:46 p.m., " 'I want to show you how much I love you punk bitch I'll beat the shit out of you then you'll know' "; at 6:49 p.m., " 'I just want to kick the shit out of you' "; and at 11:31 p.m., " 'I will fuck your life up bitch.' "[4]

On February 14—as reflected in the People's Exhibits 21 and 22—Melendez emailed Tatiana at 12:16 a.m., " 'I'll kick your teeth in punk bitch' "; and at 5:54 a.m., " 'Punk ass bitch I hate your fucking guts whore go to hell cunt.' "

On February 18—as also reflected in the People's Exhibit 22—Melendez emailed Tatiana at 9:53 a.m., " 'Punk ass bitch I'll run into you then I'll run . . . over you.' "

On May 26—as reflected in the People's Exhibit 29— Melendez emailed Tatiana at 10:21 p.m., " 'Punk ass hoe I'll punch your lights out.' "

On August 9—as reflected in the People's Exhibit 34—Melendez emailed Tatiana at 10:14 a.m., " 'I'll make you move again ha ha,' " and

out of your dumb ass,' " " 'I'll damage you more than before,' " " 'Stupid hoe I'll bust all your windows and windshield out,' " " 'I'm going to put my fist right through your face fake bitch,' " " 'I just want to blow your brains out then I'm done with you slut you'll never set me up again,' " " 'I will take vengeance on you punk ass trick,' " and " 'Ask me why I bashed your windshield stupid hoe for the same reason I'm going to bash your face in slut.' "

[4] During his testimony, the prosecutor asked Detective Deschler to highlight certain statements in Melendez's emails, including this one.

" 'Useless whore' "; and again at 10:23 a.m., " 'I'll do to your face like did [*sic*] your windshield and your front window ha ha.' "  And on August 20 at 1:40 a.m., Melendez emailed Tatiana, " 'Is your address [on] San Fernando Way.' "

At some point in August, Tatiana made a report to the San Mateo County Sheriff's office regarding Melendez's violations of the restraining order.  And on September 16, Melendez emailed Tatiana—as reflected in the People's Exhibit 45—" 'If you ever do some shit like that again I'll fucking kill you stupid cunt bitch.' "

**Melendez's Testimony**

Melendez testified briefly in his own defense.  He admitted sending the emails entered into evidence, but testified that he believed he was interacting with Tatiana's neighbor's friend Tone, who was contacting him through Tatiana's phone number and email address.

**The Jury Instructions on Unanimity**

During the lunch break, the trial court discussed meeting with counsel to edit the jury instructions.  Defense counsel then stated, "counsel and I spoke earlier . . . about some of the dates alleged for the criminal threats [that] have multiple statements that are supporting that charge, so I think for those we'll either need an election by the DA for one of those or unanimity."  The prosecutor responded, "I can just make the conversation more streamlined for February 4th.  Count 2, it's a course of conduct theory so it wouldn't require the unanimity, and then the rest are just straight elections and I can outline those in chambers later."

After the defense rested later that afternoon, the trial court instructed the jury, including with a version of CALCRIM No. 3500 on unanimity.  The instruction followed the standard form, except for the italicized language: "The defendant is charged in counts 2 through 7 with criminal threats.  *This*

5

*instruction applies to counts 2 and 6 in particular.* [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed." (Italics added.)

After the trial court finished reading the instructions and the jury left for the day, the court asked the prosecutor if there was "any record that you wanted to make in regards to the instructions given." The prosecutor took the position that a unanimity instruction was not required as to count 2 because that count described a course of conduct, based on "the fact that these threats were being submitted to Tatiana minute after minute that day." Defense counsel responded that "criminal threats is a very discrete act that requires one statement as its basis and if multiple statements are made to support the charge, then a unanimity instruction is required."

The trial court responded: "Okay. And we did have a fairly lengthy conversation about this it was off the record. [The prosecutor] did cite her authority as to why she believed the unanimity instruction was not required as did [defense counsel]. The Court ultimately was swayed by the use instructions, specifically on instruction 1300 [criminal threats],[5] which indicates at least this Court's interpretation that the unanimity instruction must be given and therefore gave that instruction specifically as to the two counts noted."

---

[5] The use notes for CALCRIM No. 1300 provide: "***Unanimity Instruction*** [¶] If the evidence discloses a greater number of threats than those charged, the prosecutor must make an election of the events relied on in the charges. When no election is made, the jury must be given a unanimity instruction. [Citations.]"

6

The prosecutor then indicated that she intended to make an election during her closing argument with respect to counts 3, 4, 5, and 7, and the trial court responded, "so, I think we're okay with the others. [¶] Anything else, Counsel, that either of you want to put on the record?" Defense counsel responded, "No, Your Honor."

**The Prosecutor's Closing Argument**

During her closing argument the next morning, the prosecutor explained: "The timeline, I want to narrow your focus on the timeline here. The charged conduct is from January 2023 through September of 2023 that is relevant because through the e-mails you're going to see e-mails from 2020, 2021, 2022, and 2023. I do not want you to get confused. I would submit to you that anything prior to 2023 is context, the build up of what happened in their relationship. But the criminal conduct is in 2023 and it ends in September because that's when he is arrested.

"The charges in this case can be grouped into three categories. First, Count 1 stalking. Counts 2 through 7 are criminal threats. Counts 8 and 9 are called technically contempt of court, which is akin to a restraining order violation, it's just the technical term that we use for it.

"The criminal threats there are six counts of them and these have certain dates, that matters because when you go to look at your e-mails in the exhibits, you want to narrow it by date. And I intend to outline each date for you so there is no confusion when you go to deliberate. February 4th is the first criminal threat. February 14th, February 18th, May 26th, August 9th, and September 16th.

"You have heard evidence of more threats than just six. That will frame your analysis for the stalking, and I'll get into that in just a moment."

After discussing the stalking count, the prosecutor went on to discuss the factual basis for counts 3, 4, 5, and 7 as follows:

"So what's Count 3, February 14th. This one unlike February 4th where there's many threats this is one for you to decide, 'I'll kick your teeth in punk bitch.' It's a threat to commit great bodily injury to kick someone's teeth in. The context for this is also relevant because in Exhibit 21, which is where you will find this threat and the e-mail right before he says, 'Because you know I beat your boyfriend's ass and I'll do it again. You also know I'm not playing and you're scared.' "

"Count 4, February 18th, 2023 this is Exhibit 22, which is why I said you just go in order reading the e-mails in context. Again, reverse chronological, 'Punk ass bitch I'll run into you then I'll run you over,' what stands out about this threat? What stands out is the use of a vehicle, this is somebody who has already sliced her tires, bashed her windshield, bashed Tone's or vandalized Tone's car, right, so the roll [*sic*] of a car here is even more compelling than just the statement itself. [¶] Because he's already inflicted violence by way of a vehicle and now he's threatening to run her over in a vehicle. Running somebody over could certainly kill them it happens all too often or it could cause great bodily injury, so it is a threat."

"May 26th, Exhibit 29 [count 5] is the exhibit that controls here. You go to Exhibit 29 you will find this threat. 'Punk ass hoe I'll punch your lights out.' It's a threat to cause great bodily injury to punch her so heard [*sic*] that she goes lights out unconscious."

"Finally, the threat of February 16th[6] which is Exhibit 45, 'If you ever do some shit like that again I'll fucking kill you, you stupid cunt bitch.' He threatens to kill her, now you see the word if there. You might be saying, well she said it couldn't be conditional. [¶] I would submit to you that this is not conditional . . . . This is a threat to kill her. Exhibit 45 is where you can find that threat."

**Jury Deliberations and Questions**

The jury began deliberating just before noon on September 25, and at 1:07 p.m., they asked, "Can we please get a list of all of the counts?" and the trial court attached a chart "prepared by counsel" in response, identifying the "Date(s) of Offense" for counts 2–7 as February 4, February 14, February 18, May 26, August 9-20, and September 16, respectively (all in 2023)—as reflected in the operative information. At 2:28 p.m., the jury asked: "For the criminal threat counts, can we pick any statement on (or around?) the date of [the] offense or should we only look at the statement that is highlighted?"

After discussing the question with counsel, the trial court responded, "You are not limited to the statements highlighted. You can rely on any statements in the exhibits so long as they occur on the same day as alleged in the information and you all unanimously agree on which statements you are relying on." Both the prosecutor and defense counsel approved the trial court's response, defense counsel in particular stating that it "[s]ounds good, Your Honor."

The jury asked a third question at 2:57 p.m., "In regards to counts 2–7, when determining if the charge rises to the level of a criminal threat, is it

---

6    The prosecutor evidently misspoke, as the email she described (contained in Exhibit 45) was sent on September 16.

relevant when the victim (Tatiana) saw the specific emails/threats? Or is it any fear felt, even if the victim first read the messages months later?" In response—and again with the express approval of the prosecutor and defense counsel—the trial court "refer[red] the jury back to Instruction number 1300 [unanimity]."

**The Verdict and Sentence**

The jury apparently reached its verdict later that afternoon, but because defense counsel had a medical emergency, it was not read until the next morning. The jury found Melendez guilty on counts 1 and 5–9 and not guilty on counts 2–4, but guilty of the lesser included offense of attempted criminal threats on those counts. After the jury was dismissed, a court trial was held on the aggravating factors, at the end of which the trial court found five of the six factors alleged to be true.

On November 25, the trial court sentenced Melendez to an aggregate prison sentence of four years and four months, comprised as follows: the middle term of two years on count 5; four months (one-third of the middle term of one year) on each of counts 2–4; eight months (one-third the middle term of two years) on each of count 6 and 7, to run consecutively; and one year on each of counts 8 and 9, to run concurrently to count 5. The court imposed a three-year middle term sentence on count 1, stayed pursuant to section 654.

Melendez filed a notice of appeal.

## DISCUSSION

**Applicable Law and Standard of Review**

"In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Because "the jury must agree unanimously the defendant is guilty of a *specific* crime," "when the evidence

10

suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid*.; see *People v. Maury* (2003) 30 Cal.4th 342, 422–423 [the "requirement of jury unanimity typically applies to acts that could have been charged as separate offenses . . . . A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged"]; *Russo*, *supra*, at p. 1135 [trial court should give unanimity instruction where "there is a risk the jury may divide on two discrete crimes and not agree on any particular crime"].)

"The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument. [Citations.] Such an election removes the need for a unanimity instruction." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341; *People v. Brugman* (2021) 62 Cal.App.5th 608, 627 (*Brugman*).) " 'Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.' " (*Brugman*, at p. 627.)

Whether a jury has been properly instructed is a question of law reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) When an appellate court reviews a potentially incomplete or misleading instruction, the relevant inquiry is " 'whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] ' " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' [Citation.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the

11

instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Fish* (2024) 102 Cal.App.5th 730, 735.)

**Melendez Has Failed to Demonstrate Instructional Error**

In a single paragraph in his opening brief, Melendez argues that the trial court "violated [his] substantial rights" and its "sua sponte duty to give a legally correct jury instruction" by "prejudicially indicating the requirement for unanimity applied more strongly to some of the criminal threat counts over others," "on a sort of sliding scale." But in order for a unanimity instruction to be required with respect to counts 3–5 and 7 at all, "the evidence [had to] suggest[] more than one discrete crime" that "could have been charged as separate offenses," such that there was a "a risk the jury may [have] divide[d] on two discrete crimes and not agree[d] on any particular crime," while still finding Melendez guilty. (*People v. Russo*, *supra*, at p. 1135; *People v. Maury*, *supra*, 30 Cal.4th at pp. 422–423.) But Melendez does not expressly identify any emails that could have supported separate charges of criminal threats with respect to counts 3–5 and 7, other than those relied on by the prosecution. Instead, he vaguely asserts that the prosecutor "identified a number of threatening statements . . . that occurred in January and February of 2023 that overlap with charged offense dates," citing a single page of the reporter's transcript where the prosecutor—in providing context for the stalking count—discussed several emails, most of which appear to have been sent on January 25 and February 3. But count 3 was alleged to have occurred on February 14, and the other three counts of criminal threats at issue after that. And the prosecutor expressly tied each count of criminal threats to a specific statement on a specific date, explaining that "evidence of more threats than just six" should "frame your analysis for the stalking . . . ." In any event, we will not develop Melendez's arguments

12

for him.  (See *People v. Flint* (2018) 22 Cal.App.5th 983, 1006, fn. 17; Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)  He has failed to articulate any way in which the jury could have " 'misunderstood and misapplied the [unanimity] instruction' " to his detriment, much less any " 'reasonable likelihood' " that it actually did so.[7]  (*People v. Young*, *supra*, 34 Cal.4th at p. 1202.)

Even if Melendez had specifically identified a way in which the jury could have convicted him on any of counts 3–5 and 7 without agreeing on the act that constituted the offense, no unanimity instruction was required because the prosecutor made clear elections regarding the specific threats on which these counts were based, " 'tying each specific count to specific criminal acts elicited from the victims' testimony' . . . in . . . closing argument." (*People v. Brown*, *supra*, 11 Cal.App.5th at p. 341.)  As noted, the prosecutor identified and read to the jury the specific statement upon which each count was based, provided the exhibit number where the statement could be found, and, at least with respect to counts 3 and 4, argued that the elements of criminal threats were established based on the statement's context.  This was more than sufficient to eliminate the requirement that the jury be given a unanimity instruction with respect to these counts.  (See *Brugman*, *supra*, 62 Cal.App.5th at p. 628 [prosecutor made clear election for criminal threats charge by twice connecting that count to a specific statement and going on to "argue that the elements of the crime were satisfied, using details of [the]

_____

[7]	Melendez's argument of error cites only two authorities, for the propositions that the "court has a primary duty to help the jury understand the legal principles it is asked to apply" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97), and that "a court . . . obviously has no sua sponte duty to misguide the jury" (*People v. Hawthorne* (1992) 4 Cal.4th 43, 75–76).  Neither found any error with respect to jury instructions on unanimity.

specific incident" during which statement was made]; *People v Jantz* (2006) 137 Cal.App.4th 1283, 1292 [same where the prosecutor "clearly informed the jury in opening and closing argument that the People were electing the threat set forth in [the victim's coworker]'s testimony as the basis of the criminal threats offense"]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 [prosecutor's election obviated need for a unanimity instruction where "the prosecutor's opening argument elected what conduct by defendant amounted to the crime charged"].)[8]

**Melendez Has Failed to Establish Prejudice**

Despite having failed to articulate any theory of error, Melendez goes on to argue that prejudice resulted from the trial court's unanimity instruction.[9] He "concedes that the erroneous version of CALCRIM No. 3500 . . . is harmless as to counts 2 and 6, because the instruction indicated the principle of unanimity applied to those counts 'in particular,'" but asserts "the same cannot be said about the other counts." The balance of his argument—contained in four sentences and devoid of citation to authority—is underdeveloped and unpersuasive. First, he observes that he sent a "a huge number of messages to Tatiana," and then that "[t]he prosecutor also

_____

[8] On reply, Melendez concedes that "the prosecutor in closing argument tied some threats to specific offense dates associated with specific counts," but then asserts—without explanation or citation to authority—that "the modified instruction itself was erroneous and likely caused confusion as to how the principle of unanimity applied to counts 3, 4, 5, and 7." Again, we will not develop Melendez's arguments for him, and we are not persuaded. (*People v. Flint*, *supra*, 22 Cal.App.5th at p. 1006, fn. 17.)

[9] Melendez argues that there is a presumption that the alleged error affected the judgment because "he has shown that the jury was instructed on correct and incorrect theories of liability." (*In re Martinez* (2017) 3 Cal.5th 1216, 1224.) We need not reach this issue, because his argument fails under any standard.

14

highlighted a number of extraneous threatening messages that were reasonably close to the charged offense dates." But neither his brief—nor the single page of transcript from the prosecutor's closing argument that he cites in support—contain any such "extraneous threatening messages."[10] This alone is fatal to his argument. (See *People v. Flint*, *supra*, 22 Cal.App.5th at p. 1006, fn. 17; *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8 ["courts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted"]; Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)

Melendez goes on to observe that the prosecutor "may have also verbally misidentified the date of the alleged threat that is associated with count 7," in apparent reference to the prosecutor's misdescribing the September 16 email supporting count 7 as the "February 16th" email. (See fn. 6, *ante*.) We fail to see how this mistake could have led to a non-unanimous verdict, or any confusion on the part of the jury—not where the prosecutor went on to accurately state the full content of the email at issue, as well as the correct exhibit number where it could be found; where the jury was elsewhere repeatedly informed of the correct date for the charge; and where the trial court expressly informed the jurors, in response to their second question, that they had to "all unanimously agree on which statements you are relying on" and that those statements had to have "occur[ed] on the same day as alleged in the information."

---

[10] Instead, Melendez appears to rely on the prosecutor's statement that he had, at some point around August 9, "decide[d] to forward a whole host of threats to Tatiana . . . ." But the prosecutor made this statement while discussing count 6, with respect to which Melendez concedes that there was no unanimity error.

Finally, Melendez asserts that the jury's second question showed that it was "struggling to apply the concept of unanimity to the criminal threat charges." Even assuming such struggle, as just noted, the trial court answered the jury's question and explained that it had to unanimously agree to base its verdict on statements made on the dates alleged in the information. Melendez does not even acknowledge that the trial court gave this answer, never mind contend that it was in any way incorrect or inadequate to dispel the confusion he alleges. In sum and in short, he has failed to demonstrate prejudicial error requiring reversal.[11]

## DISPOSITION

The judgment is affirmed.

---

[11] Given our conclusion, we need not reach the parties' arguments regarding forfeiture and ineffective assistance of counsel.

16

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A172391N)